```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,      )
                                    )
 4             Plaintiff,           )   No. 3:14-cr-00033-MO-1
                                    )
 5        v.                        )
                                    )
 6   MICHAEL DEONSHAE WILLIS, JR., )   May 4, 2015
                                    )
 7             Defendant.           )   Portland, Oregon
     _____)

 8

 9

10

11

12

13

14

15                    Sentencing Hearing

16                TRANSCRIPT OF PROCEEDINGS

17       BEFORE THE HONORABLE MICHAEL W. MOSMAN

18          UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25
```

```
1

2                            APPEARANCES

3


4    FOR THE PLAINTIFF:      Ms. Jennifer J. Martin
                             United States Attorney's Office
5                            1000 S.W. Third Avenue, Suite 600
                             Portland, OR 97204
6


7


8    FOR THE DEFENDANT:      Ms. Tiffany A. Harris
                             Attorney at Law
9                            121 S.W. Salmon Street, Suite 1420
                             Portland, OR 97204
10


11   U.S. PROBATION:         Mr. Adam Jacobson

12   U.S. PRETRIAL
     SERVICES:               Mr. Michael McFarland
13


14


15   COURT REPORTER:         Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
16                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
17                           (503) 326-8188

18

19

20

21

22

23

24

25
```

1

2                          I N D E X

3                     Sentencing Hearing

4   DEFENDANT'S WITNESSES

5   SAMANTHA BARROW
    Direct Examination by Ms. Harris              22
6   Cross-Examination by Ms. Martin               39
    Redirect Examination by Ms. Harris            48

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(P R O C E E D I N G S)

MS. MARTIN:  Good afternoon, Your Honor.  Jennifer Martin appearing on behalf of the government in the matter of the United States of America v. Michael Deonshae Willis.  This is Case No. 3:14-cr-33.

I'll note for the record the defendant is present, he is out of custody, represented by defense counsel, Ms. Tiffany Harris, and we are present before the Court for sentencing in this matter.

I know there are two other issues that the parties have brought to the Court's attention, the first being the defense counsel's request for copies of some unredacted reports, and the second being the defense counsel's motion to strike aspects of the government's sentencing memorandum.

THE COURT:  Thank you.

I have had a chance to review the motion to receive unredacted copies of certain reports.  I, for the most part, agree that most of the reports just have nothing of any importance to do with this case.  I disagree with the government on the June 3rd, 2014 report, and although what's redacted probably will end up not being of much particular use, given everything that the defense already knows, it certainly is relevant to the case.  And so I am requiring the unredacted copy be turned over.

Do you have a copy available, Ms. Martin?

```
 1            MS. MARTIN:  Your Honor, I do.  (Handing documents to
 2   Ms. Harris.)
 3            THE COURT:  And that's a page-and-a-half report.  So
 4   I'm just going to have you take a minute and read it right now.
 5            MS. HARRIS:  Thank you.
 6            (There is a pause in the proceedings.)
 7            MS. HARRIS:  Thank you.
 8            THE COURT:  You've had an opportunity to review it
 9   with your client?
10            MS. HARRIS:  (Nods head.)
11            THE COURT:  Is there anything about what you reviewed
12   that causes you to think you need additional time or anything
13   like that?
14            MS. HARRIS:  No.  We're ready to proceed, Your Honor.
15            THE COURT:  All right.
16            The second matter is the motion to strike.  You filed
17   a motion, the government responded.  Anything you wish to add
18   in light of their response?
19            MS. HARRIS:  The only thing I would add, Your Honor,
20   is that I don't think that the situation --
21            (Baby crying.)
22            THE COURT:  Just a moment.
23            Go ahead.
24            MS. HARRIS:  I don't think that the situation was
25   remedied by disclosure of the report and the witness's contact
```

1    information more than six months after the incident had
2    occurred and after the government had already promised that it
3    would not refer to or make the incident a part of the
4    sentencing process, because by that time, it was nearly
5    impossible to try to recreate the crowd of folks that was at
6    the gym playing pickup basketball.  It's a very informal
7    arrangement.  It's hard to find records of people who were
8    there.

9             Closer in time, had we been on notice, had we known
10   that this was going to become the kind of issue that it has
11   become in this case, we would have had an effort to either pull
12   the surveillance video or locate those witnesses and to talk to
13   them.

14            So the mere fact that I was, in April of 2015,
15   allowed to contact the primary witness involved in the July 30,
16   2014 event, doesn't really remedy the fact that we relied, to
17   our detriment, on the government's promise that this
18   information would not be made a part of the sentencing process.
19   Again, we think it's just a situation where for whatever
20   reason, maybe the successor AUSA did not want to be bound by
21   the first agreement, I'm not sure, but the end result to me is
22   that the government breached an unambiguous agreement not to
23   make that information part of sentencing, and in doing so,
24   gained sort of a tactical advantage because we were in a
25   position where we couldn't reach out to witnesses, pull

1  surveillance footage, and do the kind of investigation that I

2  think we've demonstrated we would do.

3         THE COURT:  All right.  Thank you.

4         Ms. Martin?

5         MS. MARTIN:  Your Honor, I disagree.  Initially, I

6  provided the report without knowing that there had been that

7  email communication between Ms. Beckerman and Ms. Harris.  I

8  was advised of that only recently.

9         The other matter is, this is a police report that was

10  publicly available.  So I don't see the conversation that

11  Ms. Harris and Ms. Beckerman had about whether or not the agent

12  would make a 302 and make that available to Ms. Harris is the

13  same thing as whether or not there was a report that was

14  generally available in any event.  It is material that I think

15  provides information the Court should have.

16         I didn't rely upon it in terms of arguing for the

17  enhancements, but it is conduct that the defendant engaged in

18  during the course of his pretrial release.

19         THE COURT:  All right.  Let's just take it one step

20  at a time, if I could.

21         So do you agree that your predecessor made a binding

22  commitment not to use it?

23         MS. MARTIN:  I agree that there was a conversation

24  between Ms. Harris and Ms. Beckerman about whether or not the

25  agent would produce a 302 about this contact, and whether or

1    not the information about the witness's name and contact
2    information would be provided.  That's what I saw in the email.
3         THE COURT:  That said, you don't agree that there was
4    a commitment not to make use of that event at sentencing?
5         MS. MARTIN:  Your Honor, if I could just have a
6    moment to take a --
7         THE COURT:  Sure.
8         (There is a pause in the proceedings.)
9         MS. MARTIN:  Your Honor, it is --
10        THE COURT:  I'm just trying to make sure I understand
11   your argument.  Let me see if I do.  I thought there wouldn't
12   be a disagreement -- and so I want to hear more from you -- on
13   whether a promise was made not to use it, anything like this at
14   sentencing, but that your position would be that that promise
15   was premised on the idea that a promise like that would mean
16   that Ms. Harris wouldn't have to look into it, but that if you
17   gave her time to look into it, you know, then the reason for
18   the promise would have fallen apart.
19        MS. MARTIN:  Your Honor, I think that more accurately
20   states my position.
21        THE COURT:  But that starts with the premise that
22   there was an actual promise not to use anything like that at
23   sentencing.  I'm not sure of your view on that.
24        MS. MARTIN:  Well, Your Honor, here is what I agree
25   Ms. Harris provided about what Ms. Beckerman said.  She did say

1     if she said nothing about it ever again, including at

2     sentencing, can I not give you the name and number.  Ms. Harris

3     agreed to that.  So that would be accurate.

4            THE COURT:  So what do you -- what do you make of

5     that, though, then?  It sounds like Ms. Beckerman, on the

6     government's behalf, promised not to make use of it at

7     sentencing.  But how are we at this point?

8            MS. MARTIN:  Well, here is part of where I think we

9     are.  Part of it is the difficulty in transferring a case under

10    any circumstances.  When I came across the report, in response

11    to a request by Ms. Harris, I provided the report to her,

12    including the contact information and the victim's name.  After

13    that time, I became aware that this conversation had taken

14    place between Ms. Beckerman and Ms. Harris.

15           THE COURT:  That part is not difficult to understand.

16    So what's your reason for -- you could have done two things, I

17    guess.  You could have said, "Oh, I didn't know that promise

18    had been made," and then honored it, or you could have had an

19    argument why you didn't feel like you were obligated to follow

20    it.

21           Tell me more why you took the latter course, what

22    your argument is for why you're not bound by it.

23           MS. MARTIN:  Your Honor, my argument in support of

24    that to Ms. Harris was that we do have an obligation to advise

25    the Court of the facts of the case, and the incident itself

1    troubled me not so much because of the conduct in the gym, but

2    the fact that the young woman was concerned enough to report it

3    to the police.  That, it seemed to me, was a concern that was

4    important for the Court to know.

5             THE COURT:  All right.  Thank you.

6             So as I've just said, it's not difficult to

7    understand how an email conversation like this could have

8    resulted in the series of events that we've had here; that is,

9    that Ms. Martin wouldn't know about it, it wouldn't come up.

10   But that doesn't make it not something that Ms. Beckerman did

11   in a way that had an impact on the defense preparation here.

12   Certainly I can understand, absent that promise, why this

13   information would be brought forward, but in light of that

14   promise, and in light of what I feel like is some degree of

15   detrimental reliance by Ms. Harris, I am granting the motion to

16   strike that portion of the government's sentencing memorandum.

17   I do so without any implication of any improper conduct, I just

18   view the original promise binding on successors.

19             And for what it's worth for any future

20   considerations, I also find the information, as Ms. Martin has

21   described it, relatively marginal to the whole case.

22             I think those are the only predicate matters,

23   Ms. Harris, that you've raised.  Is that right?

24             MS. HARRIS:  Yes, Your Honor.

25             THE COURT:  I've reviewed all of your sentencing

1    materials with some care.  I've received your video

2    presentation, which I've just had a chance to review

3    completely.

4         So I'll start with you, Ms. Martin.  Anything you

5    wish to add in addition to what you've submitted in writing?

6         MS. MARTIN:  Your Honor, I think what I want to

7    emphasize, in addition to what I submitted in writing, is an

8    appreciation of the power differential between these two

9    individuals in terms of the Court's consideration of coercion.

10   Under the sentencing guidelines 2G1.1, the application note

11   provides that coercion includes any form of conduct that

12   negates the voluntariness of the victim.  And in this case, of

13   course, the government has also asked the Court to consider

14   bodily injury as a separate matter, too.

15        In cases like this, where the Court considers the

16   position of a victim who has been involved in prostitution with

17   a pimp, there is a significant power differential.  There is a

18   significant consequence to the victim from making mistakes in

19   connection with this relationship.  There is a lack of personal

20   autonomy concerning movement, belongings, and the own use of

21   their bodies.  There are expectations and plans for them that

22   are beyond their control, and they often feel forced to do

23   things, whether it feels safe to them or not.

24        In this case, the defendant was 26 years old in 2012.

25   The victim, OT, was 20 years old.  The defendant had more than

three years of college education.  She did not.  He was 21

years old -- at least that's what he told the undercover police

officer -- when he began working as a pimp, and had been doing

so for over five years by the time he met OT.  By his own

statement, he had significant experience with prostitution.

He'd already had 25 to 30 girls working for him, although I

understand the defense sentencing materials say that it was

only a dozen or so now.  Either way, it was a significant

number of individuals.

At the time OT met the defendant, she had worked as a

prostitute before, but it was in the context of a romantic

relationship with another pimp.

THE COURT:  I'm going to pause you right there for a

moment.  What you're saying is very important.  Have a seat for

a second.  I think you'll be assisted if I tell you a little

more about my concerns, and then we'll take it from there,

because my concerns are as much evidentiary as they are

anything else.

So what you've described about the power differential

between pimps and prostitutes is, I think, mostly accurate.  I

guess I'd say it's accurate except when it isn't.  I think the

vast majority of prostitute-pimp relationships are as you

describe, but I don't want to oversimplify it.  All three of us

here have been involved in the system long enough to be aware

that there are a significant subset of prostitute-pimp

1    relationships that are almost businesslike in character, where

2    someone is just helping -- where there's a pimp helping one or

3    more prostitutes just run a business.

4         I'm not trying to say that I approve of the business

5    or that the law does, but the element of violence is missing

6    from some subset of pimp-prostitute relationships.  And we're

7    aware of that, and the question before me today is which was it

8    here:  Was it the traditional, I think, common relationship of

9    some kind of underlying violence, either real or threatened or

10   both; or was it closer to what Ms. Harris has described in her

11   sentencing materials, something more like a manager?

12         And as I take the bench here today, the answer I have

13   is I don't know yet, and what I need is evidence.  I need

14   something I can go on to make the decision.  What I have right

15   now are letters or memos from attorneys and a presentence

16   report.  The presentence report is disputed, so I can't yet

17   make a finding that it's correct without more.

18         Then, as you all know, I have to look at a hierarchy

19   of evidence.  So live testimony, for example, is more important

20   to me than unsworn statements.  And you're aware of the

21   predicted evidence that I'm going to have in front of me.  I'm

22   not going to be able to get very far down the road to figuring

23   out what kind of relationship this defendant had with our

24   victim in this case just based on attorneys telling me what

25   happened.  So I'm interested first in what evidence are you

going to give me on the things you've been telling me.

MS. MARTIN:  Your Honor, I don't have a witness to call today.  The Court should have in its sentencing materials the victim impact statement provided by OT, as well as other materials.

I think the Court, in terms of materials that it can rely upon, the defense has provided a series of messages between OT and the defendant, and in part those corroborate the differential in power that I think is present in this case and the nature of coercion that is inherent in this case.

THE COURT:  I don't want to conflate differential in power with coercion.

MS. MARTIN:  Your Honor, if --

THE COURT:  He's older and more educated, but that's not coercion.

MS. MARTIN:  He is older and more educated.  At the time he contacts her in Florida, she has broken up with her boyfriend, who was also her initial pimp.  She tells him that she is going back to school and has a job.  This is from the Facebook messages that are contained in the materials that defense counsel provided.  His response is to try to recruit her to work as a prostitute, and he sweet talks her into coming to Alaska, where she has expectations that she will be encountering the same type of relationship that she had with the only pimp that she had known before, her boyfriend.  And

1    instead, flying to Alaska, what she finds is something

2    different.  She finds the defendant and another woman, SB,

3    working as a team, having a romantic relationship, and then

4    having her work for them as a prostitute.

5              There is a significant power differential.  There's a

6    different equation than she was expecting would happen.  And

7    she initially reported even to the undercover officer that she

8    was threatened by SB, who -- she reported as well seeing the

9    defendant hit SB while she worked for him, and that that scared

10   her and made her afraid to say no.  That's corroborated by the

11   statement that SB provided to defense counsel.

12             So I think there are --

13             THE COURT:  What part of it is corroborated there?

14   That the defendant hit SB?

15             MS. MARTIN:  Yes, the fact that he hit SB.

16             It's true that while SB characterizes that as an

17   altercation of two slaps or whatever that occurred in the

18   course of their domestic relationship, I don't think it is

19   unreasonable for the Court to take a look at that and know that

20   at the same time the defendant is requiring SB to work for him

21   as a prostitute, and to infer that OT would see that conduct as

22   coercive and indicative not of a domestic dispute, but it's

23   what would happen if she didn't follow the rules.

24             THE COURT:  All right.

25             MS. MARTIN:  That same thing is true in the materials

1    the defense counsel provides concerning the first time that OT

2    left the defendant.  The first time she leaves the defendant,

3    it's because he is reading her cell phone, according to the

4    defense materials, observed that she has had a conversation

5    with another man, and hits her.  That is typical violent

6    behavior in the context of a pimp and prostitute relationship.

7    He hits her, she leaves for two days.

8            It's true that SB later in her statement says, well,

9    I didn't see any lasting damage when she came back two days

10   later, but it confirms that that physical violence happened in

11   the context of what that relationship was.

12           And then I think everyone agrees that what happened

13   to OT in Hawaii was violent and could be expected in the

14   ordinary course of running this type of an operation.

15           THE COURT:  Wouldn't that theory -- you're talking

16   about now not just coercion but bodily injury in Hawaii, or are

17   you using that as a way of it being coercive?

18           MS. MARTIN:  Your Honor, I think it was -- I think it

19   was both.  I think when we look at the nature of the

20   relationship going to Hawaii, what you have is a victim whose

21   identity is tied up in thinking that this is a partnership,

22   thinking that she has to do things to make the defendant happy,

23   which in this case is making money, and that entails putting

24   herself at risk.  The defendant is aware of that level of risk

25   and, in fact, comments on it in his conversation with the

1  undercover police officer, noting that it's, you know,

2  difficult for him to have to deal with all the complaints of

3  all of the women he manages, and telling him all about the

4  forced labor that he intended to go into rather than

5  prostitution.

6         THE COURT:  I guess what concerns me is that I

7  understand the incident in Hawaii is a theory for bodily

8  injury, but if you had a completely noncoercive pimp, didn't

9  use coercion as a part of a business plan, and a prostitute got

10 hurt by a customer, wouldn't your theory be a theory for

11 coercion then for a pimp who was otherwise not coercive?  It

12 sort of makes whether the pimp was coercive or not turn on what

13 kind of customers show up.

14        MS. MARTIN:  I think it depends on how the Court is

15 defining coercion and --

16        THE COURT:  Well, you want me to view what happened

17 in Hawaii as one piece of your theory of coercion, and I'm just

18 saying I understand it was a theory of bodily injury, but I

19 don't know how -- I don't know how your theory doesn't work

20 against every imaginable kind of pimp.  If they send someone

21 out there and the customer hurts the prostitute, that's going

22 to be, in your theory, a reason to find the pimp coercive.  It

23 may not be enough, but it will be a piece of the case, right?

24        MS. MARTIN:  I think when the Court looks at coercion

25 and looks at what negates the voluntariness of the victim's

1    conduct, you have to look at the pattern of behavior.  And if

2    the pattern of behavior includes I'm going to send you out to

3    do this and trust you enough to make all this happen, that is,

4    in fact, somewhat coercive behavior.  She's alone, she's in an

5    area that she's never been to before, doing something that she

6    may have doubts about doing to profit this defendant.  So yes,

7    I think it is both coercive and I think it's relevant to both

8    coercion and to bodily injury.  It's certainly relevant to

9    bodily injury.

10            THE COURT:  I guess what I'm trying to sort out is

11   what theories prove too much and which ones don't.  I'm

12   reminded of the case law on reasonable suspicion for a stop.

13   You know, the person did look nervous or they didn't look

14   nervous, and they both can cut against somebody.

15            Here it's coercive if I'm hovering over you all the

16   time and I never let you out of my sight, and it's coercive if

17   I send you to Hawaii alone, where you can do whatever you want.

18   I mean, I guess I don't want to come up with an idea of

19   coercion that fits every case.

20            MS. MARTIN:  No, but I think that's a continuum.

21   When the Court considers the relationship that a victim has

22   with a pimp in cases like this, the initial conduct is hovering

23   and is controlling.  And that's true in this case, where the

24   defendant didn't have a driver's license, where either the --

25   where the victim didn't have a driver's license and where SB or

1    the defendant drove her to and from places.  That certainly was

2    a lack of control on her part.  And certainly it was more of an

3    all-enveloping control issue both in Alaska and in Portland.

4    That coupled with the physical violence that she saw and

5    interpreted to mean if you are out of line, there will be

6    physical violence, merged into what happens over the course of

7    a relationship, where the defendant turns from an I love you so

8    much, I will make all these arrangements for you and I'll do

9    this, we will share the money, to gosh, now you're experienced,

10   now I can trust you going out to places on your own, and now

11   you can make these arrangements.  That's a progression that is

12   also not uncommon that also benefits the pimp because it cuts

13   him off from law enforcement investigation later on, and that's

14   the --

15            THE COURT:  It certainly sounds reasonable, but based

16   on what would I conclude that that theory of what happened here

17   is true?

18            MS. MARTIN:  I'm sorry, the Court was saying there

19   were two different things.  I was simply pointing out that I

20   see them as a continuum of behavior in a single pimp --

21            THE COURT:  What you've given me is an explanation

22   for why the facts fit --

23            MS. MARTIN:  Yes.

24            THE COURT:  -- with the theory of coercion because

25   that's how these relationships tend to play out.

1          MS. MARTIN:  Yes.

2          THE COURT:  And I suspect you may be right, I just

3   don't know based on what evidence I would conclude you are

4   right.

5          MS. MARTIN:  I think the evidence of the --

6          THE COURT:  There's really no evidence about how a

7   typical relationship plays out over time, is there, in this

8   case?

9          MS. MARTIN:  No, Your Honor, there is none.

10          THE COURT:  So they might play out that way, I just

11   don't know one way or the other.

12          Ms. Harris, let me turn to you for just a moment.

13   Are you going to put on anything other than your letter?  Live

14   witnesses?

15          MS. HARRIS:  I do have a live witness who is here and

16   prepared to testify.

17          I want to make clear that we've also appended to our

18   sentencing letter the sworn declaration of that witness, signed

19   under a penalty of perjury.  So I think when the Court talks

20   about a hierarchy of evidence, I think that hierarchy sort of

21   weighs in the defense's favor because we already have a witness

22   who --

23          THE COURT:  Well, a sworn private statement from the

24   victim in a victim impact statement, and I have your witness's

25   statement.  So I have competing pieces of paper.  Is that what

1  you want me to decide the case on?

2        MS. HARRIS:  No, Your Honor, I do have a witness, and

3  she's --

4        THE COURT:  I'm not telling you to call her, I'm just

5  saying that's what I have right now.  If you want to do better,

6  you need to call them.

7        MS. HARRIS:  I will.  I just wanted to make sure that

8  I was clear in my position that I don't think these are

9  competing pieces of evidence because the sworn statement that

10  Ms. Barrow signed is a declaration signed under penalty of

11  perjury.  There's no sworn statement basically on the other

12  side from the government.

13        THE COURT:  It's up to you.

14        MS. HARRIS:  Then at this point we'll call Samantha

15  Barrow.

16        THE COURT:  Go ahead.

17        THE CLERK:  There's stairs right along that back wood

18  wall.

19        Please raise your right hand.  Your right hand.

20        THE WITNESS:  I was kidding.

21

22                    SAMANTHA BARROW

23  called as a witness in behalf of the Defendant, being first

24  duly sworn, is examined and testifies as follows:

25

```
 1              THE CLERK:  Please have a seat.
 2              For the record, could you please state your full name
 3    and spell it.
 4              THE WITNESS:  Samantha Barrow.  S-a-m-a-n-t-h-a
 5    B-a-r-r-o-w.
 6
 7                        DIRECT EXAMINATION
 8    BY MS. HARRIS:
 9    Q.   Good afternoon, Ms. Barrow.
10    A.   Hi.
11    Q.   How old are you?
12    A.   Twenty-five.
13    Q.   Where do you live?
14    A.   In Las Vegas, Nevada.
15    Q.   What do you do in Las Vegas?
16    A.   I'm a dancer.
17    Q.   How long have you been doing that?
18    A.   In Las Vegas?
19    Q.   Yes.
20    A.   For a year.
21    Q.   I'm going to ask you some questions.  First, before I ask
22    you those questions, I want to thank you for traveling here
23    from Las Vegas.
24              I want to start with some questions about how you
25    first met the defendant in this case, Mr. Willis.
```

1    A.    Uh-huh.

2    Q.    Can you tell us about when that was.

3    A.    The time or where?

4    Q.    You can start out by saying, if you remember, about

5    when --

6    A.    I don't remember when it was, but I met him at a bar

7    downtown.

8    Q.    And do you remember about how old you were?

9    A.    About 21.

10    Q.    At that time -- I'm going to ask you some questions that

11    might be a little bit personal.

12    A.    Uh-huh.

13    Q.    I want to apologize for that in advance, but it's

14    important to the case or I wouldn't ask.

15             At that time, what were you doing for money?

16    A.    I was a prostitute.

17    Q.    So when you met Mr. Willis at this -- at this bar, did the

18    two of you have a chance to talk and sort of strike up a

19    conversation?

20    A.    Yeah.  We had been friends a long time before.

21    Q.    You were friends a long time before you met at the bar?

22    A.    Oh, no, no, no.  Before we got together.

23    Q.    I see.

24    A.    Yeah.

25    Q.    During that period of friendship, did you have an

Barrow - D

1  impression about Mr. Willis's level of experience in the sex

2  industry?

3  A.    I mean, he never really brought it -- it wasn't really

4  brought to me that way.  I didn't really think he had any

5  experience, to be quite honest.  He wasn't even -- he didn't

6  have girls around him, he didn't have -- from what I knew, I

7  didn't think he was a pimp at all.

8  Q.    And a follow-up question is, well, between the two of you,

9  did you have an opinion about which one of you had more

10  experience in this --

11  A.    No, no.  Of course, no.  It wasn't like we were competing.

12  I didn't -- I mean, I had more experience, of course.  I had

13  been doing this since I was about 18 years old, so --

14  Q.    And would you say that when you first got together, this

15  was more of a kind of a business arrangement?

16  A.    Yeah.  It was more like boyfriend-girlfriend and then got

17  to the business.

18        THE COURT:  Don't ask leading questions, please.

19  BY MS. HARRIS: (continuing)

20  Q.    When you first got together with Mr. Willis, how long were

21  you together before you started working?

22  A.    Hmm.  I would say about a month or two before I started

23  working.

24  Q.    I want to ask you some questions about -- about the

25  boyfriend-girlfriend relationship that you said you had.  Did

1   Mr. Willis take you home to meet his family?

2   A.   Yeah.  I met all his family.

3   Q.   Did you take him home to meet your family?

4   A.   Yeah.  My mom loves him, his grandma liked me.

5   Q.   Did you socialize with each other's friends?

6   A.   Uh-huh, yeah.

7   Q.   Did you go out on what we would consider to be dates and

8   that sort of thing?

9   A.   Yeah.  We went to the movies, stuff like that.

10  Q.   At a certain point, though, did you begin to travel

11  outside of Oregon for the purpose of work?

12  A.   At some point we did, yes.

13  Q.   Where?  Where did you go?

14  A.   Went to Alaska, Hawaii, a few places.

15  Q.   How did that come about?

16  A.   Well, I had never been to Hawaii, Mike had never been to

17  Hawaii, and so we just really wanted to go.

18  Q.   Did you make that travel part of the work that you were

19  doing?

20  A.   I mean, yeah.  We would work in the work with it, of

21  course.

22  Q.   So, in other words, when you would travel to these

23  locations like Alaska and Hawaii, you would go there for the

24  purpose of work?

25  A.   Yeah.

1          MS. MARTIN:  Object to leading again.

2          THE COURT:  Sustained.

3   BY MS. HARRIS: (continuing)

4   Q.   When you would travel to these other locations, were you

5   there as a tourist or were you there for business purposes or

6   was it both?

7   A.   I think it was both, yes.

8   Q.   Did Mr. Willis ever force you to travel --

9   A.   Never.

10  Q.   -- to any of these destinations?

11  A.   Not once.

12  Q.   Did he ever threaten that if you didn't travel to these

13  locations, he would hurt you?

14  A.   Never.

15  Q.   Did he ever do anything else to you that you -- did he

16  ever threaten to do anything else to you that you wouldn't like

17  or that made you scared?

18  A.   No.  I've never been scared of Mike.

19  Q.   And when I was using the word "work" in connection with

20  this travel to places like Alaska or Hawaii, what does that

21  include?

22  A.   Honestly, it depends on the state.  For the most part, I

23  would prefer to dance if I could, but I would -- I would work

24  as a prostitute.

25  Q.   Did Mr. Willis ever force you to dance at a place when you

Barrow - D

1  didn't want to?

2  A.    No.

3  Q.    What made you want to do it, then, if you weren't being

4  forced?

5  A.    To travel or to work?

6  Q.    To work.

7  A.    To make money.  I was by myself for a long time.  I work

8  because I like money.  Mike's never made me get money.  I've

9  always worked because that's the type of person I am.  I'm very

10  independent.  I always like to have my own money and I like to

11  work.

12  Q.    Were you and Mr. Willis ever in Anchorage together during

13  the summer of 2012?

14  A.    Yes.

15  Q.    Where were you staying at that point?

16  A.    I think we got a house, I believe.  We rented.

17  Q.    Did Ms. Turner come and join up with you two at some

18  point?

19  A.    Yeah.

20  Q.    Do you remember about when that would have been?

21  A.    I want to say maybe a week or two after we'd been there.

22  I really don't remember honestly the exact date.

23  Q.    Does around mid to late August 2012, does that sound about

24  right?

25  A.    Yeah, that sounds right.

1  Q.   Now I want to ask you some questions about the time that

2  the three of you spent together in Anchorage.  Okay?

3  A.   Okay.

4  Q.   So first, what were you doing in Anchorage?

5  A.   I was dancing at the Fish Company.

6  Q.   Is the summertime -- tell me about what it's like to be

7  dancing in Anchorage during the summer season.

8  A.   It's a really busy season, so any of the newer girls were

9  required to go to work at 4:00, so you go to work at 4:00.

10  It's not busy, so we normally had to stay later.  It's just

11  like nobody is there from 4:00, because that's when it opens.

12  So I would go from 4:00 until whenever I felt like it.

13  Q.   When you said that the new girls were required to start at

14  4:00 --

15  A.   Yeah, like if you're not from Anchorage.  Like you get

16  paid to work in Anchorage, so if I'm new and I come down there,

17  I have to start at 4:00.  So I don't have like the privileges

18  of the people that have been there.

19  Q.   And that's a rule that --

20  A.   That's a rule of the club, yes.

21  Q.   Thank you.

22        Were you only dancing or were you also going on

23  dates?

24  A.   I was doing both.

25  Q.   I'm sorry?

Barrow - D

1   A.   I was doing both but mainly dancing.

2   Q.   Did Mr. Willis ever hit you when you were in Anchorage?

3   A.   No.

4   Q.   Did he ever use physical force to get you to go on any of

5   these dates or to dance?

6   A.   Never.

7   Q.   Did he ever pull your hair?

8   A.   Never.

9   Q.   Now, so we've heard a little bit about what you were

10  doing.  What do you remember Ms. Turner to be doing at this

11  time?

12  A.   Ms. Turner didn't have the proper identification to work

13  in the strip club, so she had to prostitute.  So I really

14  wasn't there the whole time, I was at work, like I said, but

15  from what I know, she couldn't work at the clubs, so she had to

16  work other ways.

17  Q.   And did the decision to go on dates or to prostitute

18  rather than work at a club, how -- were you there?  Do you have

19  any knowledge about how Ms. Turner made that decision?

20  A.   I don't.

21  Q.   Did she ever complain to you in Anchorage that she was

22  going on dates and didn't want to be doing that?

23  A.   Never, no.

24  Q.   During the time that you were in Anchorage, did you ever

25  see Mr. Willis hit Ms. Turner?

Barrow - D

1    A.    No.

2    Q.    Did you ever hear Ms. Turner complain that Mr. Willis was

3    holding on to her identification?

4    A.    No, never.

5    Q.    Did Ms. Turner ever tell you that she didn't want to be

6    prostituting or going on dates?

7    A.    No.  From what I know, she'd been doing it.

8    Q.    Did she ever tell you that she was scared to say no to

9    Mr. Willis?

10   A.    No.

11   Q.    Now I'm going to ask you some questions about the time

12   that you spent after you left Anchorage.

13            Do you remember where you went after Anchorage?

14   A.    Back to Portland, I believe.

15   Q.    And were the three of you there in Portland together?

16   A.    Oh, yeah, at one point.

17   Q.    Do you remember about when you left Anchorage to return to

18   Portland?

19   A.    Do I remember the date?

20   Q.    More or less.

21   A.    No.  I mean, I remember it was right before my -- well,

22   actually no.  I don't want to say.

23   Q.    Does late August, or August 29th sound about right?

24   A.    Yeah, yeah, yeah.  Because that was right before my

25   birthday.

Barrow - D

1   Q.   When is your birthday?

2   A.   September 13th.

3   Q.   When -- and one last question.  Before -- or during,

4   throughout this time in Anchorage, did you ever hear Ms. Turner

5   tell anyone that she wanted to leave?

6   A.   Not once.

7   Q.   So tell us about what the setup was like in Portland where

8   the three of you were staying.

9   A.   We all stayed in an apartment together.  I mean, when we

10  were -- like, when we were in Portland, I mean, it was just the

11  same thing.  We all stayed in the house together.  Everyone did

12  their own thing.

13  Q.   Was it a house or was it an apartment?

14  A.   It was an apartment.

15  Q.   So during this time that you spent together in Portland,

16  were you working?

17  A.   At that time, no.  It was about my birthday, so nobody was

18  really working at that time.

19  Q.   And just so the Court has an idea of what the timeline is

20  like, about how long were the three of you in Portland before

21  you traveled again?

22  A.   We stayed in Portland until a couple days after my

23  birthday, so --

24  Q.   Does September 24th sound about right?

25  A.   Yeah.

Barrow - D

1  Q.   The date that you would have left Portland?

2  A.   Yeah.

3  Q.   So if we are talking about the beginning part and the end

4  part of your stay in Portland, is it August 29th to

5  September -- like 24th?  Does that sound about right?

6  A.   Yeah, I guess, yeah.

7  Q.   During that period of time, what were you doing for money?

8  A.   Probably dancing.  I don't think I was working, though.  I

9  really don't remember working.  I don't remember working at

10 that time.

11 Q.   And would it be common for you to take -- essentially take

12 some time off or take a vacation?

13 A.   Oh, yeah, very common.

14 Q.   Can you tell us anything else about the kinds of things

15 that you did during this sort of vacation period in Portland.

16 A.   I went and hung out with my friends, my family.  I mean,

17 whatever.

18 Q.   Do you have family here in Portland?

19 A.   Yeah, my family is here.

20 Q.   Do you know whether Ms. Turner also had family here in

21 Portland?

22 A.   I don't know, actually.  I believe so.

23 Q.   Did -- do you know whether Ms. Turner was making social

24 visits outside of the house?

25 A.   Yeah.

1    Q.    What did you do for your birthday celebration on

2    September 13th?

3    A.    All of us went out, including Onjahnae.  We all went and

4    we just went to some bars downtown.

5    Q.    Do you have any idea whether Ms. Turner was working during

6    this period of time?

7    A.    On my birthday?

8    Q.    I'm sorry, no.  During the time that you were staying --

9    A.    No, no.  Neither of us were working.

10   Q.    Did Mr. Willis ever tell you not to leave Ms. Turner alone

11   in the apartment or the house where you were staying?

12   A.    No.

13   Q.    Did you ever see Mr. Willis make Ms. Turner go someplace

14   that she didn't -- seemed to not want to go?

15   A.    Not one time.

16   Q.    Did Mr. Willis ever accuse you and Ms. Turner of stealing

17   his money?

18   A.    Never.

19   Q.    Did he threaten to beat your asses if you did not return

20   something that he thought was stolen?

21   A.    No, ma'am.

22   Q.    Have you ever -- I'm going to ask you a couple of

23   questions.  About how long did your relationship with

24   Mr. Willis last?

25   A.    About a little over a year.

Barrow - D

1  Q.   Can you tell us -- well, how did the relationship end?

2  A.   At the time he was traveling to Vegas a lot, and I got

3  upset with him, so I kicked him out of my house, and that was

4  it.

5  Q.   Did he have things inside the house?

6  A.   Yeah.  His grandma came over to help him get some of his

7  things out of the house, and it wasn't that big of a deal.  But

8  I was just tired of him leaving me and going to Vegas and

9  stuff, so --

10 Q.   After he and his grandmother took his things out of the

11 house, did he contact you after that?

12 A.   A few times, but it wasn't -- I mean, it was just like hi,

13 you know.

14 Q.   Did you -- did you feel threatened by any of those

15 contacts?

16 A.   Never, not once.

17 Q.   Did you have an impression about why he might have been

18 contacting you?

19 A.   I mean, he obviously wanted me to come back.  I mean, he

20 never like threatened me to come back or threatened if I didn't

21 come back or anything like that.

22 Q.   Was it more like a boyfriend trying --

23 A.   It was more like, "I miss you, Babe," and stuff like that,

24 not, you know --

25 Q.   Now, can you remember during the whole period of time that

Barrow - D

1    you were with Mr. Willis, do you have any memory of an

2    altercation that involved the two of you, you and Mr. Willis?

3    A.   Yes.

4    Q.   Can you tell us about those circumstances.

5    A.   Me and Mr. Willis got into an argument once, and I threw

6    something at him, and in defense he slapped me.

7    Q.   Do you remember what it was you threw at him?

8    A.   I think it was a part of the couch.

9    Q.   And at that point was Ms. Turner still --

10   A.   She was gone.  She was gone -- she was long gone by then.

11   Q.   Did Mr. Willis ever hit you in front of Ms. Turner?

12   A.   No.

13   Q.   Did you ever see an altercation between Mr. Willis and

14   Ms. Turner?

15   A.   Yes.

16   Q.   Do you remember where that would have been?

17   A.   In our apartment.

18   Q.   Where was that?

19   A.   In Beaverton.

20   Q.   So during the time that the three of you were staying in

21   Portland?

22   A.   Yes.

23   Q.   And did Ms. Turner have an injury that you saw?

24   A.   No.

25   Q.   Did you see any blood or bruising?

1    A.    No, ma'am.

2    Q.    Can you tell us a little bit more about what you remember

3    just seeing happen.

4    A.    I remember them arguing.  When I came upstairs, she like

5    lunged at him like she was going to punch him or whatever, and

6    he like smacked her away, and then that was it.

7    Q.    Do you remember the specifics of their argument?

8    A.    I do not, actually.

9    Q.    Do you remember what happened next?

10   A.    I believe Onjahnae left.

11   Q.    Did she come back?

12   A.    Yeah.  She called crying to come back.

13   Q.    Are you the person who received that call?

14   A.    No.  I was there when he received it, though.

15   Q.    You were there when Mr. Willis got that call?

16   A.    Yes, ma'am.

17   Q.    And then after Mr. Willis received the call, what

18   happened?

19   A.    He went and got her.

20   Q.    About how long would you say she was gone for?

21   A.    Less than 48 hours.

22   Q.    Between 24 and 48 hours?

23   A.    Yeah.

24   Q.    Was that before the trip to Hawaii or after the trip to

25   Hawaii?

1   A.    It was before.

2   Q.    So can you tell us a little bit about how it was that you

3   went to Hawaii.

4   A.    I had a court date in Hawaii, so I already was -- needed

5   to be in Hawaii, so Onjahnae just came with me.

6   Q.    Whose idea was it to have Ms. Turner accompany you to

7   Hawaii?

8   A.    She wanted to come.  She'd never been to Hawaii.

9   Q.    And are you saying that because that's something you heard

10  her say or something that you --

11  A.    I mean, she seemed very excited to go to Hawaii.  She

12  seemed -- I mean, I've been to Hawaii before, she's never been,

13  so, I mean, I didn't hear her say, "I can't wait to" -- I mean,

14  but I heard -- by her actions she was very excited to go.

15  Q.    So did the two of you travel on the same flight?

16  A.    Yeah, I believe so.

17  Q.    When -- and where did you arrive at Hawaii?

18  A.    Waikiki.

19  Q.    What was the plan for Waikiki?

20  A.    To walk the streets.

21  Q.    And when you say "walk the streets," I'm assuming there

22  are a number of ways to sort of get the job done, to do the

23  work of solicitation and prostitution.  Why was that the chosen

24  method in Waikiki?

25  A.    I mean, I've danced out there, too, but it's not good

Barrow - D

```
 1   money.  The best money out there is to walk the streets.

 2   Q.   So at that point did you and Ms. Turner do that together?

 3   A.   Uh-huh.

 4   Q.   For how long?

 5   A.   For one day.  She didn't feel comfortable with it.  Her

 6   and Mike discussed going to Maui, and she went to Maui the next

 7   day.

 8   Q.   Did you go with her to Maui?

 9   A.   No.  I like Waikiki.

10   Q.   Do you know whether Ms. Turner earned any money while she

11   was in Waikiki?

12   A.   No, not that I remember.

13   Q.   You don't remember whether she did or she didn't?

14   A.   I'm pretty sure she did not make any money.  That's why

15   she wanted to go to Maui.

16   Q.   And you -- did you ever join up with Ms. Turner when she

17   was in Maui?

18   A.   No, ma'am.

19   Q.   Why did you get on a plane and come here to testify today?

20   A.   The accusations against me are very false, as well as

21   Mike.  I haven't spoke to Mike in years.  I don't know

22   Onjahnae, but the accusations against me are very horrible, and

23   I don't want that on my name at all.

24   Q.   When you say the accusations against you, what are the

25   accusations against you?
```

1    A.   Saying I've been beaten, saying I've been forced.  That's

2    not -- if you knew me, you know that it would never go down

3    like that.

4    Q.   I see.

5           MS. HARRIS:  I don't have any more questions for the

6    witness.  Thank you.

7           THE COURT:  Thank you.

8           Ms. Martin.

9           MS. MARTIN:  Thank you, Your Honor.

10

11                        CROSS-EXAMINATION

12   BY MS. MARTIN:

13   Q.   Ms. Barrow, did you write this declaration?

14   A.   No.

15   Q.   Who did?

16   A.   Mike's lawyer.

17   Q.   And when was the first time you saw it?

18   A.   I saw it the next day, when I read through it.

19   Q.   And you made corrections on it?

20   A.   Yes, ma'am.

21   Q.   You mentioned that you, in this statement, were putting

22   yourself through a community college.

23   A.   Yes.

24   Q.   And you knew that Mr. Willis had some college education as

25   well?

1   A.    Uh-huh.

2   Q.    And at the time that you were working for him, he had

3   specific amounts of money he wanted you to make?

4   A.    No.

5   Q.    He had aspirational goals that he wanted you to make?

6   A.    He never set a number for me -- an amount for me to make.

7   He's never set a certain amount he needed me to make.  It's

8   never been that type of relationship.  He talked about building

9   together, more or less, not you have to make this amount of

10  money.  It was never like that.

11  Q.    But you did turn your money over to him?

12  A.    Absolutely.

13  Q.    And he talked with you about building goals together?

14  A.    Absolutely.

15  Q.    The two of you had a romantic relationship in addition to

16  the working aspect of life?

17  A.    Uh-huh.

18  Q.    And at the time you met Ms. Turner, you were 22?

19  A.    Yes.

20  Q.    And Mr. Willis was 26?

21  A.    Uh-huh.

22  Q.    And in your statement, you noted that Mr. Willis helped

23  you get your driver's license reinstated?

24  A.    Yes, he did.

25  Q.    He didn't do that for Ms. Turner, did he?

1   A.    She wasn't around long enough.

2   Q.    He didn't do that for her, did he?

3   A.    No.

4   Q.    And there wasn't any effort while she was in Alaska to try

5   to get her identification there, was there?

6   A.    I'm sorry, can you repeat the question?

7   Q.    Sure.  She arrived in Alaska with her birth certificate;

8   isn't that right?

9   A.    I don't remember.

10  Q.    She didn't have a driver's license, did she?

11  A.    No.

12  Q.    So she had some other form of identification?

13  A.    Okay.

14  Q.    And she couldn't work at the club because she was too

15  young; isn't that right?

16  A.    Because she didn't have her identification -- her card,

17  her ID.

18  Q.    She had a birth certificate and she wasn't 21?

19  A.    You can work at -- you don't have to be 21 to work there.

20  If you have a card, if you have an identification card, you can

21  work there.

22  Q.    She couldn't work there?

23  A.    Yes.

24  Q.    And he didn't do anything about making it possible for her

25  to work there?

Barrow - X

1  A.    She didn't have a problem about working there.

2  Q.    The question is, the defendant didn't do anything to allow

3  her to work there, did he?

4  A.    What could he have done to help her allow her to work

5  there?  I don't get the question.

6  Q.    Did he help you get a driver's license?

7  A.    I had an ID, though.  You don't have to have a driver's

8  license to work there, ma'am.

9  Q.    He didn't do anything to help her in that regard?

10  A.    No, I guess.

11  Q.    In fact, your report even said it would have been more

12  convenient if she had had a driver's license so that you guys

13  didn't have to accompany her everywhere she went?

14  A.    If she had an ID, yes.  You can't have a person get a

15  driver's license in Alaska if she's not from there.

16  Q.    But he didn't make any effort to get her a driver's

17  license, did he?

18  A.    No.

19  Q.    He helped you with your consumer credit rating?

20  A.    Yes.

21  Q.    He didn't do that for her, did he?

22  A.    No.

23  Q.    Were you aware that he was arrested in 2010, and that two

24  witnesses heard a woman say, "I can't let you hurt me anymore"?

25         MS. HARRIS:  Object, Your Honor.

```
 1              THE COURT:  Just a moment, ma'am.
 2              THE WITNESS:  No.
 3              THE COURT:  Just a moment.  Don't answer the
 4   question.
 5              THE WITNESS:  I'm sorry.
 6              MS. HARRIS:  Your Honor, I'm objecting to relevance
 7   at this point.
 8              THE COURT:  As to relevance, I overrule it.
 9              You can answer the question.
10              THE WITNESS:  Can you repeat the question, please?
11   BY MS. MARTIN: (continuing)
12   Q.   Yes.  Were you aware that in 2010, he was arrested after
13   two witnesses heard a woman say, "I can't let you hurt me
14   anymore"?
15   A.   No.
16   Q.   In 2012, before Ms. Turner joined you, were you aware she
17   had a job in Florida?
18   A.   No.
19   Q.   Were you aware that she was planning to go back to school?
20   A.   Never.
21   Q.   Were you aware that the defendant recruited her to come up
22   to Alaska to join you?
23   A.   No.
24   Q.   Were you aware that he encouraged her through some
25   romantic texts?
```

Barrow - X

1    A.    No.

2    Q.    You didn't know what her expectations were when she

3    arrived in Alaska, did you?

4    A.    No.

5    Q.    You did know that she was younger than you.  She was just

6    20 when she arrived.

7    A.    I was 22.

8    Q.    You knew she was younger?

9    A.    Yeah.

10   Q.    You knew she was younger than Mr. Willis, who was 26?

11   A.    Yes.

12   Q.    You knew she had just broken up with her ex?

13   A.    No.

14   Q.    You knew she had broken up with her ex?

15   A.    No.

16   Q.    I think in your report, you say that her ex had picked her

17   up at a house.  You knew she had an ex?

18   A.    I knew she had an ex.  We didn't talk when we broke up and

19   all that.  Everybody has an ex.

20   Q.    You knew that when she went to Maui, she was alone and

21   that she hadn't been there before?

22   A.    Yes.  That was her choice.

23   Q.    And that she talked to Mr. Willis about going to Maui

24   before she went there?

25   A.    Yes, ma'am.

Q.   And he told her where to stay?

A.   No.

Q.   He told her what to do when she got there?

A.   No.

Q.   He had been there before?

A.   No.

Q.   You became aware at some point that she was hospitalized for being -- that she went to the hospital after being raped in Maui?

A.   Yes.

Q.   You didn't go join her on the other island?

A.   No, because I didn't believe she was raped.

Q.   Whether you believed it or not, you didn't get on a plane and take less than a half-hour flight to go over to see the woman who you had been living with on and off for two months?

A.   No.

Q.   There were times when Mr. Willis would take a look at your telephone; isn't that right?

A.   Sure.

Q.   And he would look at her phone, at Ms. Turner's phone?

A.   Sure.

Q.   And there were times when he told you where -- I'm sorry, that he told Ms. Turner where the dates were and would transport her to them and from them?

A.   Could you repeat the question?

1   Q.   Sure.   There would be times when he would make the

2   arrangements for the dates and he would transport her to and

3   from the dates?

4   A.   No.

5   Q.   So he had nothing to do with arranging the dates?

6   A.   Well, we never had a calendar with dates on it.   It would

7   be very random.   It would be a group decision that we would all

8   go.   It wouldn't be him saying you have to go here and here on

9   these dates.   That's not what the arrangement was.

10  Q.   There were occasions when he was the person who made the

11  arrangements, though, for Ms. Turner to go, and then he

12  transported her to and from the dates?

13  A.   Not that I know, no.

14  Q.   Who would transport her to and from dates?

15  A.   Like drive her?   I thought you meant on a plane.   Yeah.

16  Q.   Okay.

17  A.   Yeah.   I thought you meant like on a plane transport her.

18  Q.   Let's back up.   There were times when Mr. Willis would

19  make the arrangements for the date and drive her in a car to

20  and from the date?

21  A.   He would not make the arrangements.   He would drive her to

22  the dates.

23  Q.   And he would take the money for the dates?

24  A.   Of course.

25  Q.   After Mr. Willis looked through Ms. Turner's phone and

1  slapped her, she left for a day or two?

2  A.   Yes.

3  Q.   And you agree that at some point, I think your statement

4  says on one or two occasions, Mr. Willis slapped you?

5  A.   One occasion.

6  Q.   You signed this under the penalty of perjury?

7  A.   Yes.

8  Q.   And I believe that in paragraph 10, you said that you

9  could remember one or two times when he hit you.

10  A.   I said one and two times, and I don't remember any other

11  time besides the one time.  He's not a violent person.

12  Q.   He was aware of the risk that you and Ms. Turner faced

13  every time you went out on a date?

14  A.   Yes.

15  Q.   And he had, before Ms. Turner joined you, experience with

16  other girls working as prostitutes for him?

17  A.   I'm sorry, would you repeat the question?

18  Q.   He had other women working as prostitutes for him before

19  Ms. Turner arrived?

20  A.   Sure.

21  Q.   And after Ms. Turner left -- because she left after the

22  rape in Maui, didn't she?

23  A.   Yes.

24  Q.   He tried to recruit her back again?

25  A.   Not that I was aware of.

Barrow - ReD                          48

```
 1   Q.   He had a goal of becoming rich through the work of other
 2   people:  you, Ms. Turner, and others?
 3   A.   No.
 4   Q.   Really?  Tell me how many jobs he had during the period of
 5   time that you were with him.
 6   A.   He didn't have any jobs, but we -- we didn't -- he didn't
 7   plan on becoming rich off of us.  He planned on helping all of
 8   us become rich.
 9   Q.   He didn't have a job during the entire time you knew him,
10   did he?
11   A.   Not at all.
12            MS. MARTIN:  I have nothing further.
13            THE COURT:  Any redirect?
14
15                      REDIRECT EXAMINATION
16   BY MS. HARRIS:
17   Q.   Ms. Barrow, when the three of you were in Alaska, was
18   there any plan of becoming permanent Alaska residents?
19   A.   No, ma'am.
20   Q.   Did you take any other steps in Alaska to do things like
21   join any organizations?
22   A.   No.
23   Q.   To buy like a permanent piece of property?
24   A.   No.
25   Q.   Did anyone buy a car in Alaska?
```

1   A.    Not that I know of.

2   Q.    You said that Mr. Willis hadn't been to Maui before.

3   A.    No.

4   Q.    Had he been to other parts of Hawaii?

5   A.    Yeah.  He'd been to Waikiki.

6   Q.    Just not Maui?

7   A.    He'd never been to Maui before.

8   Q.    Did Ms. Turner ever talk to you about a dashed hope or

9   kind of a dashed dream of returning to school?

10  A.    Honestly, I've never heard her say not one thing about

11  school since I've known her.

12  Q.    Did she ever tell you like where she was in school?

13  A.    I didn't even know she went to school.

14  Q.    There was a little bit of talk back and forth -- and it

15  might have been confusing -- about what kind of identification

16  you need to use to dance in Alaska.

17  A.    Uh-huh.

18  Q.    I want to ask you a couple questions about that.

19  A.    Okay.

20  Q.    Is that the kind of identification that has a photograph

21  in it?

22  A.    It's any identification with your photograph on it and

23  your state.  It's not required to have a driver's license, just

24  an identification card.

25  Q.    And to your knowledge, did Ms. Turner have a photograph --

1    I'm sorry, have a piece of identification with a photograph on

2    it?

3    A.    No, ma'am.

4                  THE COURT:  That's all I need.  Thank you.

5                  MS. HARRIS:  Thank you.

6                  THE COURT:  You can take your seat.

7                  THE WITNESS:   (Complies.)

8                  THE COURT:  We're focused on 2G1.1B1, the four-level

9    enhancement.  Is there anything else you wish to first of all

10   litigate before we hear argument on sentencing, Ms. Martin?

11                 MS. MARTIN:  No, Your Honor.

12                 THE COURT:  I'll hear your argument generally on

13   sentencing, just what you think the right sentence is.

14                 MS. MARTIN:  Your Honor, the government is --

15   continues to recommend a 48-month sentence, and the reason for

16   that, I think, is that the -- there is evidence of coercion

17   sufficient for the Court to find that level of enhancement.

18   Even with the contested issues in this case, what the Court has

19   is evidence that the -- OT, when she went to Alaska, from the

20   documents provided by defense counsel, had the expectation that

21   she was going to encounter something different than she did.

22   She did not have --

23                 THE COURT:  Just a moment.

24                 (To the court security officer) Would you tell them

25   to be quiet out there.

1     (There is a pause in the proceedings.)

2     THE COURT:  Thank you.

3     Go ahead.

4     MS. MARTIN:  When she flew, she didn't have the

5  conventional identification, and unlike the efforts that the

6  defendant made for Ms. Barrow, he made no such efforts for

7  Ms. Turner.  That in itself is somewhat coercive, as is a

8  flight to a location where she knows no one and doesn't have

9  the ability to gain other employment.

10     I think, in addition to that, the Court has the

11  evidence from the witness that there was the physical force

12  used in Portland at the time the defendant was going through

13  Ms. Turner's phone and she left for a period of time.

14     I think those factors are sufficient for the Court to

15  find an enhancement for coercion.  I think the risk that the

16  defendant ran that the women who he was using to profit from

17  through acts of prostitution would be injured or raped in the

18  course of their work for him is certainly borne out by the

19  events in Hawaii, and that the level for the physical violence

20  due to the bodily injury that the government is requesting is

21  lessened by the fact that the defendant wasn't personally

22  there, he didn't personally inflict the violence, and is

23  tempered, as I indicated in the sentencing memo, by the

24  government's agreement to take into consideration the

25  defendant's performance on pretrial supervision and the efforts

1    that he's made so far.

2           For those reasons and the other reasons outlined in

3    the government's sentencing memorandum, the government believes

4    that a period of incarceration of 48 months is appropriate,

5    coupled with the forfeiture in this case, a five-year term of

6    supervision, which is the minimum term of supervision I believe

7    the Court could impose in this case, and the $100 fee

8    assessment.

9           I'm sorry, it's a $200 fee assessment, due to the

10   fact it was two counts rather than one count.

11          THE COURT:  Thank you.

12          Ms. Harris.

13          MS. HARRIS:  Thank you, Your Honor.

14          With respect to the enhancement, you know, the first

15   thing I want to say is that this is an issue that needed a

16   face.  Ms. Barrow was willing to come in and sort of withstand

17   the crucible of cross-examination, and it's difficult not to

18   have had the same opportunity to place Ms. Turner on the stand

19   and to allow the Court to sort of -- to observe what would

20   happen in that same truth-telling process I think on the

21   very -- on the key facts in the case about whether or not

22   Ms. Turner's voluntariness was negated by physical force,

23   threats of physical force, or other conduct that could be

24   viewed as coercive.

25          I don't see how at this point the Court can credit

1  the majority of the allegations that were unsworn and that were

2  the basis going forward for the government's decision to seek

3  an enhancement.   There are entire portions now of Ms. Turner's

4  statement dealing with being an eyewitness to physical force on

5  the part of Ms. Barrow, accusations that she was driven from

6  place to place as a means of coercing her or otherwise negating

7  her voluntariness.   I think it's significant that the trip to

8  Hawaii happened after she already made a decision to return,

9  and I think it's also important for the Court to consider the

10  circumstances or the motivations that each party had when they

11  offered their statements.

12           THE COURT:   We've gone over that.   Thank you.   I've

13  read that.

14           MS. HARRIS:   So I think with respect to the

15  enhancement, I don't think the government has met its burden.

16  I think these relationships are complicated, and I think that

17  in asking the Court to view complex human relations in very

18  rigid terms, I think we lose sight of some realities.   I think

19  those were the realities that Ms. Barrow illustrated for the

20  Court today.   Again, I don't think the burden has been met

21  here.

22           THE COURT:   So you believe the guidelines are at 14?

23           MS. HARRIS:   Yes, Your Honor.   I think without the

24  enhancement, the advisory guideline range would be -- with the

25  criminal history of category 3, it would be 18 to 24 months at

```
 1  an offense level -- I want to double-check -- at 14, sentencing
 2  guidelines.  If you'll just -- that is -- yes, an offense
 3  level, actually, of 13, with an advisory guideline range --
 4            THE COURT:  Why 13?  You said 14 a minute ago.
 5            MS. HARRIS:  I know I did, and I just looked at my
 6  chart and what I thought I had.  But let me just check the plea
 7  agreement as well.
 8            MS. MARTIN:  I think that's the multiple-count
 9  adjustment.
10            MS. HARRIS:  What is?
11            MS. MARTIN:  It was a base offense level of 14, plus
12  2 for multiple-count adjustment, less 3 for acceptance of
13  responsibility, which would be a level 13.
14            THE COURT:  Does your client wish to say anything?
15            THE DEFENDANT:  Yes, I will, Your Honor.
16            First off, I want to apologize to the victims.  I
17  don't feel that I physically hurt them, but I think I might
18  have did some mentally or emotionally or messed with their
19  psyche.
20            Also, during the time I've been out on my pretrial
21  release, I understand -- I got a full meaning of what I was
22  doing.  It was more, like I said, like an addiction, and more
23  like a habit, in a way, like with narcotics.  One of my
24  teachers, Mr. Wolf, would say that I got a little fire
25  underneath me, that I'm starting to find myself and I'm
```

1    starting to be more back into like the school structure and

2    understanding things in life that I was really missing, and

3    obviously it's not all about money, it's more about just having

4    true values and loyalty to your family.

5              THE COURT:  Thank you.  You can be seated.

6              My first job is to calculate the sentencing

7    guidelines correctly.  Often that's a mechanical process.

8    Today it's a process of deciding, as best I can, what really

9    happened here, particularly on two questions:  the question of

10   bodily injury and the question of coercion.

11             Bodily injury is a little bit simpler.  The theory is

12   that it's a bodily injury for which the pimp is responsible if

13   he directs a prostitute to put herself in harm's way and a

14   customer hurts her.  And there are certainly cases where that

15   could be the case, but I don't agree that it would be the case

16   always.  I don't always believe that a pimp is responsible

17   under the sentencing guidelines for bodily injury caused by a

18   customer.  I don't see anything here on the facts as I

19   understand them that would make this defendant responsible for

20   that customer's actions under the guidelines.  So I decline to

21   utilize that sentencing enhancement in the case.

22             The second enhancement has to do with coercion.  And

23   that's defined as something that negates the voluntariness of

24   the victim's willingness to participate in the sex industry as

25   a prostitute.  And so I think I have to take those words at

1  face value.  "Negates" means erases for the most part or gets

2  rid of.  Whether it has to completely zero it out, I doubt, but

3  it has to have a powerful impact on someone's voluntariness.

4  That's how I read coercion here.

5          And we have competing stories, first of all.  There

6  is the story told by the things that the United States has

7  submitted, and that is in competition with the story told by

8  the things the defense has submitted, including the live

9  testimony of Ms. Barrow.

10          It's not a hard-and-fast rule, by any stretch, that

11  live testimony somehow will beat a paper document, not by any

12  stretch.  But here I find a number of things important about

13  the live testimony.  One is that it was -- it created an

14  opportunity to test credibility, and that was important, I

15  think, given the different motivations involved and the nature

16  of the testimony.  I think it was important to have

17  cross-examination.

18          And so I find that the testimony submitted by

19  Ms. Barrow is more persuasive on many points than competing

20  testimony of somewhat inferior evidentiary value.  Very few

21  people are 100 percent credible.  She did, however, admit some

22  things that a total liar probably wouldn't have admitted, and

23  seemed on the core point of whether this defendant was coercive

24  and abusive to her, seemed adamant and believable that that was

25  not their relationship.  And although she wasn't around all the

time and couldn't vouch for everything, she seemed adamant and mostly believable on the question of whether in her presence Ms. Turner was abused or acted like someone who had been abused.

I don't pretend to know what happened here -- I can only go on the evidence in front of me -- but that evidence was tested in a way that in my view makes it something I can place greater reliance on than the untested and unsworn statements of the victim in this case.

I think it was Albert Einstein who said that everything should be made as simple as possible, and no simpler, and so I am reluctant to simply assume that this relationship was one grounded in coercion because of a relatively modest age difference, a relatively modest increase in education on the part of the defendant, or other factors.

I do have to decide whether coercion could be present even based on the things Ms. Barrow admitted, and that's a more difficult call.  She did admit that on at least one occasion, the defendant struck Ms. Turner, and it's my finding that that evidence, while certainly revealing of this defendant's character, his willingness to strike a woman, doesn't amount to sufficient evidence of coercion under the guidelines.  So I decline to impose that enhancement.

Ms. Harris has asked for a lower-than-guidelines sentence for a variety of reasons, all of which I reject.  I

1  think they do not constitute sufficient reasons to depart from

2  the guidelines here.

3       Mr. Willis, I'm certainly glad that you have taken

4  some time to go through treatment and tried to look inside

5  yourself to see how you ended up where you ended up.  I know

6  it's real popular to talk in the language of addiction; I did

7  this because I was addicted to money or I was addicted to the

8  fast lifestyle.  There's certainly some truth to that, I'm

9  sure.  But you also did these things because you just decided

10  you were going to do it, take a shortcut, be a pimp.  And so

11  those decisions are -- well, first of all, illegal -- that's

12  what brought you here -- and I hope you reach the day where you

13  decide they're also unworthy of the man you want to become,

14  that you reach a day where you're just ashamed that that's the

15  shortcut you chose.

16       When I say I don't find coercion, what I'm saying is

17  that I don't find evidence sufficient to believe that you beat

18  Ms. Turner.  But she was just barely on the far side of being a

19  child, and you helped and assisted and maybe even urged that

20  she engage in prostitution to help you make money.  Her, too,

21  but you make money.  You thought it was more important that you

22  be rich than that she get out of that lifestyle.

23       So I think it's completely fair that the law hold you

24  seriously responsible for that.  You were grown up enough, with

25  enough life experience to know what you were doing.  Nobody had

1  a gun at your head making you be a pimp.

2          I know you've had disappointments and even great

3  difficulties in life.  None of them justify what you did.  I'm

4  sure when you showed up in Kansas and your basketball career

5  went down the tubes, I'm sure that was a crushing time for you,

6  but it doesn't remotely justify what you turned around and did

7  with it.  So I'm hoping you'll take a different path from here

8  on forward.  You don't have much of a criminal history.  This

9  is going to be serious.  But when it's over, I hope you never

10  end up in court again.

11          I adopt the guidelines as correct, with the -- a

12  correct statement of the advisory range in this case -- excuse

13  me.  I adopt the presentence report as a correct statement of

14  the advisory range in this case, with the alterations that I've

15  just explained, and I find that the resulting range, with the

16  low end of 18 months, is not only correct under the guidelines

17  but a fair and just sentence under Section 3553(a).

18          As to Count 2, you're committed to the Bureau of

19  Prisons for confinement for a period of 18 months.  Upon

20  release, you'll serve a five-year term of supervised release,

21  subject to the standard conditions adopted by this Court and

22  the following special conditions:  you'll cooperate in the

23  collection of DNA, you'll observe reentry court, you'll have no

24  association with prostitutes, you'll not frequent areas or

25  places where prostitution is a known activity.

1    Do you understand that?

2    THE DEFENDANT:  Yes, sir.

3    THE COURT:  You'll reside in a residence approved by

4  the probation officer and notify him or her five days before

5  any change in residence, and you'll stay nightly at that

6  residence unless prior notice is made to the officer.

7    So you can't have a home and then end up spending

8  nights with somebody else, making that your second home.  You

9  have to live at home.  Do you understand?

10    THE DEFENDANT:  Yes, sir.

11    THE COURT:  If the law requires it, you'll register

12  under any state sex offender registration agency where that's

13  required by law.

14    You'll participate in and successfully complete a

15  program for domestic violence counseling, as approved by the

16  officer.

17    You'll have no contact with the victims of the

18  instant offense in person, by telephone, correspondence, or

19  third party, unless approved in advance.  So that's Ms. Turner

20  and Ms. Barrow.  Do you understand that?

21    THE DEFENDANT:  Yes, sir.

22    THE COURT:  I know she may contact you after this is

23  all over.  Just tell her that I told you you couldn't speak

24  with her or email her or Facebook her or anything.  Understood?

25    THE DEFENDANT:  Yes, sir.

THE COURT:  You'll provide the U.S. probation officer with truthful and complete information regarding all mobile phones, computer hardware, software, electronic services, data storage media, the whole computer ball of wax.  You have to disclose all of that so your probation officer knows what you're doing in the online world.

And you'll submit to a search of your mobile phone or computer or anything like it at a reasonable time and place and manner, based upon any reasonable suspicion of a violation or condition of supervision.

Your employment shall be subject to the approval by the probation officer.

As to Count 3, you receive the same sentence, same conditions, concurrent with the sentence imposed on Count 2.

I'm not ordering any fine.  You do have to pay a fee assessment of $100 on each count, for $200, due immediately and in full.

The dumbest thing you can do when you get out of prison here is to be involved in any way with prostitution.  Do you get that message?

THE DEFENDANT:  Yes, sir.

THE COURT:  You've waived some or all of your appeal rights.  Those waivers are generally enforceable.  If you still think you have the right to appeal, you have to file a notice within 14 days of the entry of judgment.

1    I do view you as suitable for voluntary surrender.

2    You're directed to report to an institution to be determined by

3    the Bureau of Prisons on June 18th, 2015.

4    I don't know if there's still time, Ms. Harris, to

5    report to the Marshals Service before you leave the building

6    today, but try to.

7    And then if not, then it will have to be tomorrow for

8    further instructions on voluntary surrender.  All right?  So

9    they'll give you instructions on how to voluntarily surrender.

10    That means you're out between now and June 18th.

11   Don't get in any trouble between now and then.

12    Any pending charges requiring dismissal or other

13   resolution?

14    MS. MARTIN:  Your Honor, there is a pending charge

15   requiring dismissal.  I believe it's Count 1.

16    I would also like to note that there is a forfeiture

17   matter for the Court's pronouncement.

18    THE COURT:  Any objection to me signing this

19   forfeiture order?

20    MS. HARRIS:  No, Your Honor.

21    MS. MARTIN:  And, Your Honor, finally, I know that

22   the pretrial services officer has requested that curfew be

23   reimposed, and I join that request.

24    THE COURT:  I agree.  You've been in technical

25   violation by going to Vancouver, and you've been up late in

```
 1   ways that almost got you in trouble.  So I am imposing a
 2   midnight curfew between now and the day you go to prison.
 3   Don't violate it.
 4               THE DEFENDANT:  Yes, sir.
 5               THE COURT:  Anything further from the defense?
 6               MS. HARRIS:  Your Honor, we would request a
 7   recommendation that Mr. Willis be placed at Sheridan so that
 8   his family can visit him while he's incarcerated.
 9               THE COURT:  I will so recommend.  Although we had no
10   introductions, I see what I believe to be maybe even a dozen
11   family supporters and friends here.  I'm sure they'll visit him
12   if he's allowed to serve at Sheridan.  He's a relatively young
13   man with family nearby.  I recommend that he be allowed to
14   serve his time at Sheridan.
15               Yes, sir?
16               THE PRETRIAL SERVICES OFFICER:  As far as the
17   self-surrender, Your Honor, we normally seek, if he goes
18   somewhere other than Sheridan, to California, wherever the BOP
19   designates him, I wanted permission to remove the GPS prior to
20   that, to allow him to get to that location without it.
21               THE COURT:  That's fine.
22               We'll be in recess.
23               MS. MARTIN:  Thank you.
24               THE CLERK:  This court is adjourned.
25               (Proceedings concluded.)
```

1

2                                    --o0o--

3

4          I certify, by signing below, that the foregoing is a

5    correct transcript of the record of proceedings in the

6    above-entitled cause.  A transcript without an original

7    signature or conformed signature is not certified.

8

9

     /s/Bonita J. Shumway              5/14/2015
10   _____          _____
     BONITA J. SHUMWAY, CSR, RMR, CRR  DATE
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25